Slip Op. 07-163

UNITED STATES COURT OF INTERNATIONAL TRADE

WIELAND-WERKE AG, PRYMETALL
GmbH & CO. KG, SCHWERMETALL
HALBZEUGWERK GmbH & CO. KG
and WIELAND METALS, INC.,

       Plaintiffs,

       v.

UNITED STATES,

       Defendant,

       and

EAGLE BRASS CO., HEYCO METALS
INC., LUVATA BUFFALO, INC.,
OLIN CORPORATION-BRASS GROUP,
PMX INDUSTRIES, INC., REVERE
COPPER PRODUCTS, INC., and
SCOTT BRASS,

       Defendant-Intervenors.

Before:    WALLACH, Judge

Court No.:   06-00135

**PUBLIC VERSION**

[Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is DENIED and the Agency's Determination is AFFIRMED.]

Dated: November 7, 2007

Arnold & Porter LLP, (Michael T. Shor and Jonathan S. Batten) for Plaintiffs Wieland-Werke AG, Prymetall GmbH & Co. KG, Schwermetall Halbzeugwerk GmbH & Co. KG, and Wieland Metals, Inc.

Charles A. St. Charles, Attorney-Advisor, James M. Lyons, General Counsel, Andrea C. Casson, Assistant General Counsel for Litigation, Office of the General Counsel, U.S. International Trade Commission, for Defendant United States.

Kelley Drye Collier Shannon, (David A. Hartquist, Jeffrey S. Beckington, and Kathleen W. Cannon) for Defendant-Intervenors Eagle Brass Co., Heyco Metals, Inc., Luvata Buffalo, Inc., Olin Corporation-Brass Group, PMX Industries, Inc., Revere Copper Products, Inc., and Scott Brass.

**Wallach, Judge:**

## OPINION

## I

### INTRODUCTION

Plaintiffs, Wieland-Werke AG ("Wieland-Werke"), Prymetall GmbH & Co. KG ("Prymetall"), Schwermetall Halbzeugwerk GmbH & Co. KG ("Schwermetall"), German producers and exporters of brass sheet and strip ("BSS"), and Wieland Metals, Inc. ("Wieland Metals"), a U.S. subsidiary of Wieland-Werke, move for judgment on the agency record, challenging the final determination of the U.S. International Trade Commission ("ITC" or "the Commission") in its five-year sunset review of certain antidumping and countervailing duty orders, as published in Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, and Japan, USITC Pub. 3842, Inv. Nos. 701-TA-269 and 731-TA-311-314, 317, and 379 (Second Review) (March 2006) (Public Version), Final Edited BPI Version of the Commission's Views (Confidential Version) ("Views"), Defendant's Appendix, List 2, Doc. 183. Plaintiffs contest, first, the Commission's finding that German BSS imports are likely to have a discernible adverse impact[1] on the domestic BSS industry if the antidumping duty ("AD") order on German imports

---

[1] The statute specifically provides that "[t]he Commission shall not cumulatively assess the volume and effects of imports . . . in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7) (emphasis added). This opinion will restate the statutory obligation using affirmative language,

were revoked.[2] Plaintiffs also contest the Commission's determination that revocation of the

orders in place with respect to the cumulated countries would likely lead to the continuation or

recurrence of material injury to the United States domestic industry within a reasonably

foreseeable time.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The Commission's findings

are supported by substantial evidence and are otherwise in accordance with law.

## II

## BACKGROUND

On February 19, 1987, the Commission determined that the BSS industry in the United

States was being materially injured by less than fair value ("LTFV") imports of BSS from

France, Germany, Italy, and Sweden. Certain Brass Sheet and Strip from France, Italy, Sweden,

and West Germany, USITC Pub. 1951, Inv. Nos. 701-TA-270 (Final) and 731-TA-313, 314, 316,

and 317 (Final) (February 1987). Commerce subsequently issued AD orders on BSS from

France, Germany, Italy, and Sweden, and a countervailing duty ("CVD") order on BSS from

France. Antidumping Duty Order; Brass Sheet and Strip From the Federal Republic of Germany,

i.e. that in order for the Commission to permissibly exercise its discretion to cumulatively assess

the volume and effect of imports, it must find that the subject imports are likely to have a

discernible adverse impact on the domestic industry. Rephrasing the statutory terminology in

this fashion simplifies the discussion but does not alter its meaning. See Neenah Foundry Co. v.

United States, 25 CIT 702, 712, 155 F. Supp. 2d 766 (2001) ("When the ITC considers whether

subject imports are likely to have no discernible adverse impact, the result of the inquiry will be

either negative or affirmative. Logic and grammar indicate that a negative finding is that such

imports will have a discernible adverse impact.")

[2] The Commission is required to make such a finding if it intends to cumulate the subject
imports from various countries for purposes of the material injury analysis. 19 U.S.C. §
1675a(a)(7).

52 Fed. Reg. 6,997 (March 6, 1987), as amended by 52 Fed. Reg. 35,750 (September 23, 1987); France, 52 Fed. Reg. 6,995 (March 6, 1987); Italy, 52 Fed. Reg. 6,997 (March 6, 1987), as amended by 52 Fed. Reg. 11,299 (April 8, 1987); Sweden, 52 Fed. Reg. 6,998 (March 6, 1987). Countervailing Duty Order, Brass Sheet and Strip from France, 52 Fed. Reg. 6,996 (March 6, 1987).

The Commission initiated the first sunset review of these orders on February 1, 1999.[3] Brass Sheet and Strip From Brazil and France; Brass Sheet and Strip From Brazil, Canada, France, Italy, Korea, Sweden, Germany, Japan, and the Netherlands, 64 Fed. Reg. 4,892 (February 1, 1999). The Commission determined that revocation of the AD and CVD orders in place would likely lead to recurrence or continuation of material injury to the domestic industry within a reasonably foreseeable time. See Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, Korea, the Netherlands, and Sweden, USITC Pub. 3290, Inv. Nos. 701-TA-268, 270 (Review) and 731-TA-317 and 379-380 (Review) (April 2000). German producers did not participate in the first sunset review.

The Commission initiated this second sunset review of the disputed AD and CVD orders on March 31, 2005. Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, and Japan, 70 Fed. Reg. 16,519 (March 31, 2005). The German producers and the domestic BSS industry participated fully in the review. The Commission decided to conduct a full review of BSS from Germany based on the receipt of adequate responses from both the domestic and German respondent interested parties. Brass Sheet and Strip from Brazil, Canada, France,

---

[3] The Commission reviewed AD and CVD orders on BSS from a number of other countries during this sunset review.

4

Germany, Italy, and Japan, Explanation of Commission Determinations on Adequacy (July 2005).

The Commission exercised its discretion to cumulate BSS imports from France, Germany, Italy, and Japan after concluding (1) that revocation of each AD order would likely have a discernible adverse impact on the domestic BSS industry, Views at 14-20, and (2) that the subject imports were likely to compete with the domestic like product if the AD orders on BSS imports from those countries were revoked,[4] id. at 20-23. The Commission ultimately determined that revocation of the orders would likely lead to continuation or recurrence of material injury to the domestic BSS industry within a reasonably foreseeable time. Id. at 31. Plaintiffs challenge the Commission's final determination, as well as certain aspects of the methodology employed by the Commission to make that determination. Plaintiffs' Initial Brief in Support of their Rule 56.2 Motion for Judgment on the Agency Record ("Plaintiffs' Motion") at 1-4.

First, Plaintiffs seek to broaden the scope of the "likely" standard pursuant to which the Commission conducts sunset reviews. Id. at 16; see 19 U.S.C. § 1675a. Plaintiffs contend that because the "likely" standard requires a probability – and not merely a possibility – that volume, price effects, and adverse impact will occur and increase, the evidence must show that it is a "rational economic option" to increase exports in order to support an affirmative determination. Plaintiffs' Motion at 16; Plaintiffs' Reply Brief in Support of their Rule 56.2 Motion for

---

[4] The Commission found that BSS imports from Brazil faced different conditions of competition than those from France, Italy, Germany, and Japan; accordingly, BSS from Brazil was not cumulated for purposes of the material injury analysis. Views at 24. The Commission found that BSS imports from Canada were not likely to have a discernible adverse impact on the

Judgment on the Agency Record ("Plaintiffs' Reply") at 1-2. It is this contention which underlies Plaintiffs' challenges to both the "discernible adverse impact" component of the Commission's cumulation analysis and the Commission's likelihood of material injury analysis. Plaintiffs' Motion at 1-4; Plaintiffs' Reply at 1-2.

Specifically, Plaintiffs challenge the Commission's findings that if the orders were revoked: (1) German producers would have some incentive to increase BSS exports to the United States; (2) German producers would likely use their unutilized BSS production capacity to increase BSS exports to the United States; (3) increased BSS exports to the United States are likely, based on the "export-orientation" of German (and other subject) producers; and (4) German producers would likely sell BSS in the United States at prices significantly below prevailing U.S. producers' prices. Plaintiffs' Motion at 1-4. Plaintiffs characterize their challenge to each of these findings as "relevant to both [the Commission's] discernible adverse impact cumulation analysis and its likelihood of material injury analysis." Id. at 1. Plaintiffs assert that each of these findings are "unlawful" and, on this basis, argue that both the Commission's "discernible adverse impact" and ultimate "likelihood of material injury" determinations are not supported by substantial evidence. Id. at 4. Plaintiffs also challenge the Commission's "parallel and related findings" with respect to France, Italy, and Japan. Id. at 3-4. According to Plaintiffs, "[b]ecause the Commission largely employed the same analysis and reasoning in its likely adverse impact cumulation analysis and likelihood of injury analysis with respect to Italy, France, and Japan as it did for Germany, such findings and conclusions are unlawful for the same reasons." Id. at 31.

domestic BSS industry and, therefore, did not cumulate BSS imports from Canada. Id.

## III

## STANDARD OF REVIEW

In a sunset review, the court is required to uphold a determination by the Commission unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). A party "challenging the Commission's determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" Nippon Steel Corp. v. United States, 458 F.3d 1345, 1358 (Fed. Cir. 2006) (internal citations omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938) (citing Appalachian Elec. Power Co. v. N.L.R.B., 93 F.2d 985 (4th Cir. 1938)). There must be "[a] rational connection between the facts found and the choice made" in an agency determination if it is to be characterized as supported by substantial evidence and in accordance with law. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962). The court must not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S. Ct. 456, 465, 95 L. Ed. 456 (1951). Even when presented with "point[s] detracting from the substantiality of the evidence," the court will affirm the agency's determinations as long as they are reasonable and supported by the record. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir. 1984).

In reviewing an agency's construction of a statute, the court undertakes the two-step analysis established by the Supreme Court in Chevron U.S.A., Inc. v. Nat. Res. Def. Council,

Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). First, the court must consider "whether Congress has directly spoken to the precise question at issue." Id. at 842. If it has, the court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, Congress has not spoken directly on the issue, the court looks at whether the agency's interpretation "is based on a permissible construction of the statute." Id. The agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S. Ct. 2441, 57 L. Ed. 2d 337 (1978). The court must defer to the agency's reasonable interpretation of a statute even if the court might have preferred another. Id. In assessing the reasonableness of the agency's interpretation, the court's function is not to "reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 342 F. Supp. 2d 1267, 1272 (CIT 2004).

## IV

## DISCUSSION

### A

### Overview of Sunset Review Statutory Provisions

The Commission and the Department of Commerce are required to conduct sunset reviews five years after publication of an AD or CVD order or a prior sunset review. 19 U.S.C. § 1675(c)(1). In a sunset review of an AD or CVD order, the Commission determines "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time." 19 U.S.C. § 1675a(a)(1). The Commission has discretion to cumulatively assess the volume and effect of subject imports from several countries for

purposes of the material injury analysis, so long as certain requirements are met. Nippon Steel Corp. v. United States, 494 F.3d 1371, 1374 n.4 (Fed. Cir. 2007) (citing 19 U.S.C. § 1675a(a)(7)). In order to cumulate imports from a group of countries, the Commission must: (1) initiate all reviews to be cumulated on the same day; (2) find that the subject imports to be cumulated would be likely to compete with each other and with domestic like products in the U.S. market; and (3) determine that the subject imports to be cumulated are likely to have a "discernible adverse impact" on the U.S. industry. 19 U.S.C. § 1675a(a)(7).

After making the threshold determination whether to cumulate, the Commission must determine whether revocation of the order under review would be likely to lead to continuation or recurrence of material injury. Nippon Steel Corp., 494 F.3d at 1374 n.4. To that end, the Commission is directed to evaluate the likely volume, likely price effects, and likely impact of the subject imports – or cumulated subject imports, as the case may be – on the domestic industry. 19 U.S.C. § 1675a(a)(2)-(4). When conducting this evaluation, the Commission must take into account: (1) its prior injury determinations; (2) whether any improvement in the domestic industry is related to the order under review; (3) and whether the industry is vulnerable to material injury in the event the order is revoked. 19 U.S.C. § 1675a(a)(1)(A)-(C). The presence or absence of any one factor does not necessarily give decisive guidance with respect to the Commission's final determination. 19 U.S.C. § 1675a(a)(5).

Plaintiffs have conflated the statutory requirements relevant to the Commission's threshold determination whether to cumulatively assess the volume and effect of imports from various countries with the statutory requirements relevant to the Commission's material injury analysis. Plaintiffs' characterization of the issues presented for appeal does not comport with the

statutory regime governing sunset reviews, as "the statutory bar for finding no discernible adverse impact is lower than that for ascertaining material injury." Usinor, 342 F. Supp. 2d at 1282. Finding a discernible adverse impact is "not the same as finding a negative adverse impact . . . which is part of the ultimate analysis of whether the domestic industry is likely to be materially injured." Nippon Steel Corp., 494 F.3d at 1379 n.6.

This opinion first evaluates Plaintiffs' challenge to the Commission's interpretation of the "likely" standard; it then discusses whether substantial evidence supports the Commission's substantive findings with respect to the discernible adverse impact component of the cumulation analysis, and the likelihood of continuation or recurrence of material injury analysis.[5]

**B**

**The "Likely" Standard**

Proper interpretation of the word "likely" is of great significance in the sunset review process. See 19 U.S.C. § 1675(c); see, e.g., Siderca S.A.I.C. v. United States, 391 F. Supp. 2d 1353, 1356-57 (CIT 2005). Indeed, the word "likely" qualifies each of the inquiries that the Commission must make when conducting a sunset review. To illustrate, in making the threshold determination whether to cumulatively assess the volume and effects of imports from different countries, the Commission must find that imports from each of those countries independently are "likely" to have a discernible adverse impact on the domestic industry. 19 U.S.C. § 1675a(a)(7).

---

[5] Plaintiffs' challenge to the Commission's "parallel findings and conclusions" with respect to France, Italy, and Japan is relevant only to the cumulation analysis because likelihood of continuation or recurrence material injury is analyzed on the basis of cumulated imports, as appropriate. See 19 U.S.C. § 1675a(a)(7). In the instant review, the Commission reached a collective conclusion about the likely volume, likely price effects, and likely impact of the cumulated BSS imports. Views at 40-41.

After this preliminary assessment, the Commission must determine whether material injury is "likely" to continue or recur. 19 U.S.C. § 1675a(a)(1). In making that determination, the Commission must make specific inquiries with respect to the "likely" volume, "likely" price effects, and "likely" impact of the subject imports. 19 U.S.C. § 1675a(a)(2)-(4).

It is well settled that "in all statutory construction cases, we begin with the language of the statute." Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002). The legislature is presumed to "say[] in a statute what it means and mean[] in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: judicial inquiry is complete." Id. at 461-62 (internal quotations omitted). The court's task is to determine "'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Id. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)). "[U]ndefined terms in a statute are deemed to have their ordinarily understood meaning." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994) (citing United States v. James, 478 U.S. 597, 604, 106 S. Ct. 3116, 92 L. Ed. 2d 483 (1986)).

Although the word "likely" is not defined in either 19 U.S.C. § 1675(c) or 19 U.S.C. § 1675a, its meaning is not ambiguous. The common dictionary meaning of likely is "probable." See, e.g., WEBSTER'S THIRD NEW INT'L DICTIONARY 1310 (1986) ("of such a nature or so circumstanced as to make something probable"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 721 (11th ed. 2003) ("having a high probability of occurring or being true"). Indeed, this court has previously found "likely" to mean "probable" within the context of 19 U.S.C. §§ 1675(c) and 1675a(a). See, e.g., Siderca, 391 F. Supp. 2d at 1356-57; NMB Singapore Ltd. v.

11

United States, 288 F. Supp. 2d 1306, 1351 (CIT 2003); Usinor Industeel, S.A. v. United States, 26 CIT 1402, 1403-04 (2002), aff'd, 112 Fed. Appx. 59 (Fed. Cir. 2004). This court has rejected the argument that "likely" should be interpreted as meaning something between "possible" and "probable." See, e.g., Usinor Industeel, S.A. v. United States, 26 CIT 467, 474-75 (2002); Usinor Industeel, S.A., 26 CIT at 1403-04. In addition, the court has clarified that finding something is "probable" requires a finding that something is "more likely than not." Siderca, 350 F. Supp. 2d at 1227 n.3; AG der Dillinger Huttenwerke v. United States, 26 CIT 1091, 1100-01 (2002). Therefore, there is no dispute that the probable standard requires more than an indication of possibility, which would be "counter to the clear meaning of the statute." Usinor Industeel, S.A., 26 CIT at 475.

Plaintiffs assert that under the likely standard, "the evidence must show that it is a 'rational economic option'" to increase exports. Plaintiffs' Motion at 16 (citing Siderca, 350 F. Supp. 2d at 1237 n.16, 1238; Chefline Corp. v. United States, 25 CIT 1129, 1137-1139 (2001)). However, this alleged requirement of "rational economic option" does not exist in any relevant statutory provision, see, e.g., 19 U.S.C. §§ 1675(c), 1675a, or in any judicial decisions binding this court. Neither Siderca nor Chefline stand for the proposition that a finding of either likely discernible adverse impact or likely continuation or recurrence of material injury must be substantiated by evidence that increasing exports to the United States is a "rational economic option."

In Siderca, the court evaluated the Commission's findings with respect to likely volume. 350 F. Supp. 2d at 1224. When evaluating the likely volume of subject imports under 19 U.S.C. § 1675a(a)(2), the Commission is required to evaluate four specific sub-factors, as described

more fully in Section IV D (1) <u>infra</u>. To the extent that <u>Siderca</u> can be read as supplementing the statutorily prescribed likely volume analysis with a requirement that the Commission find a specific economic incentive on the part of foreign producers to increase exports to the United States, that requirement is narrowly defined. <u>Siderca</u> was based primarily on the specific language of 19 U.S.C. § 1675a(a)(2)(D), the fourth sub-factor in the likely volume analysis, i.e. "the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products."

350 F. Supp. 2d at 1235. The <u>Siderca</u> court reasoned as follows:

> Specifically, the statute directs the ITC to consider the potential for product-shifting "if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." 19 U.S.C. § 1675a(a)(2)(D). Under the statute, the physical ability to produce subject merchandise using facilities now otherwise occupied is the necessary condition for considering the potential for product shifting. Such physical ability does not, on its own, indicate that the subfactor is satisfied. To hold otherwise would render the first clause of 19 U.S.C. § 1675a(a)(2)(D) superfluous. If the mere physical ability to product-shift was sufficient to show the "potential" to product-shift, then there would be no reason to direct the ITC to consider that potential above and beyond a finding of the physical ability to product-shift. Therefore, <u>the Court must conclude that Congress intended 19 U.S.C. § 1675a(a)(2)(D) to be satisfied only when, in addition to the physical ability to product-shift, product-shifting was otherwise a viable option.</u>

<u>Id.</u> at 1237 (emphasis added).

Indeed, the <u>Siderca</u> court clarified its rationale for examining that sub-factor so closely:

> The ITC does not indicate exactly how much weight it gives the product-shifting subfactor, but under the Court's reading of the Commission's Views, it appears to be substantial. <u>Given that the evidence supporting the other three statutory subfactors is minimal at best</u>, it appears to the Court that if the ITC's volume finding is to be supported by substantial evidence and in accordance with law, the ITC must indicate something beyond the mere physical possibility of product-shifting, and show that product-shifting is potentially a rational economic option in light of revocation of the orders.

Id. at 1238 (emphasis added).

In Chefline, the court evaluated the Commission's decision to cumulate imports from a group of countries. The court held that the Commission's conclusion was not supported by substantial evidence for several reasons, including that "the Commission cite[d] no relevant evidence in support of its finding that [foreign] producers have an incentive to increase sales in the direct sales channel." 25 CIT at 1138-39. As in Siderca, the additional "requirement" that the Commission find a specific economic incentive to increase exports is narrowly tailored to the issues presented. In Chefline, the issue which gave rise to the court's statement regarding economic incentive was whether the plaintiff foreign producers were likely to shift their then-existing focus on production of lower-quality merchandise to production of higher-quality merchandise in order to compete with domestic like product and thus meet the "reasonable overlap of competition" requirement in the Commission's cumulation analysis. Id. at 1137-40.

In neither Siderca nor Chefline, the only cases cited by Plaintiffs to support their expansive reading of the "likely" standard, did the court attempt to re-define, enhance, or otherwise supplement the statutory regime governing sunset reviews. The word "likely," which qualifies each of the inquiries the Commission is required to make in a sunset review, is defined as "probable." The Commission conducted the instant review in accordance with that definition of the "likely" standard. Views at 25.

14

## C

### The "Cumulation" Analysis

In order to cumulate imports from a group of countries for purposes of the material injury analysis, the Commission must: (1) initiate all reviews to be cumulated on the same day; (2) find that the subject imports to be cumulated would be likely to compete with each other and with domestic like products in the U.S. market; and (3) determine that the subject imports to be cumulated are likely to have a "discernible adverse impact" on the U.S. industry. 19 U.S.C. § 1675a(a)(7). While cumulation is discretionary, even if the statutory requirements are met, the statute does contain an express prohibition on cumulation "in a case in which [the Commission] determines that [the subject] imports are likely to have no discernible adverse impact on the domestic industry." Id. The Commission's exercise of discretion, however, must be "predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." Freeport Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985).

The Commission exercised discretion with regard to cumulation even before it had a statutory basis to do so. See, e.g., Lone Star Steel Co. v. U.S., 10 CIT 731, 734, 650 F. Supp. 183 (1986). The Commission's approach was simply to cumulate "where the conditions of trade so warrant[ed]." USX Corp. v. United States, 11 CIT 82, 87, 655 F. Supp. 487 (1987). The Trade and Tariff Act of 1984 introduced statutory guidelines for cumulation into the U.S. regulatory regime governing international trade. Pub. L. No. 98-573, § 612(a)(2), 98 Stat. 2948, 3033 (October 30, 1984). Under that Act, the discretion of the Commission was extended to the effects of "imports from various countries that each account individually for a very small percentage of total market penetration, but when combined may cause material injury." H.R.

Rep. No. 98-725, at 37 (1984), reprinted in 1984 U.S.C.C.A.N. 5127, 5174. Although Congress

continued to refine the standards, the intent behind cumulation remained the same – to avoid a

situation in which "competition from unfairly traded imports from several countries . . . has a

hammering effect on the domestic industry," but that effect is not adequately addressed because

"the impact of the imports [is] analyzed separately on the basis of their country of origin." H.R.

Rep. No. 100-40, pt. 1, at 130 (1987). Further, the Uruguay Round Agreements Act ("URAA")

Statement of Administrative Action ("SAA")[6] recognized that cumulation "has long been a

critical component of U.S. antidumping and countervailing duty law," and stated that the

"domestic industry can be injured by a particular volume of imports and their effects regardless

of whether those imports came from one source or many sources." SAA, Pub. L. No. 103-465, at

847 (1994).

Plaintiffs challenge only the third element of the statutory test for cumulation – the

Commission's finding of likely discernible adverse impact. Plaintiffs' Motion at 4; Plaintiffs'

Reply at 1.

Congress has not provided specific guidance to the Commission on the contours of the

likely discernible adverse impact analysis. In the absence of specific guidance, "the Commission

generally considers the likely volume of subject imports and the likely impact of such imports on

_____

[6] The Uruguay Round Agreements Act was signed into law on December 8, 1994. The Act approved the new WTO Agreements resulting from the Uruguay Round of multilateral trade negotiations under the auspices of the General Agreement on Tariffs and Trade (GATT), as well as the Statement of Administrative Action proposed to implement the WTO Agreements. 19 U.S.C. §§ 3511(a)(1)-(2). The SAA is "regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the URAA] in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

the domestic industry within a reasonably foreseeable time if the orders are revoked." Allegheny

Ludlum Corp. v. United States, 475 F. Supp. 2d 1370, 1376 (CIT 2006). It is generally

understood that:

> [T]he discernible impact standard is relatively easy for the ITC to satisfy. . . .
> Nevertheless, a reasonable finding of likely discernible adverse impact requires that
> the ITC establish that it is likely that [the producer] could obtain a discernible amount
> of [the product in question] from somewhere--such as by exploiting excess capacity,
> by shifting from domestic and internal production, or by shifting from other export
> markets--and would have some incentive to sell a discernible amount into the U.S.
> market.

Cogne Acciai Speciali S.p.A. v. United States, No. 04-00411, 2005 Ct. Intl. Trade LEXIS 130, at
*13-14 (internal citations omitted).

According to Plaintiffs, the Commission erred in finding that German producers would

have an incentive to increase BSS exports to the U.S. based on the existence of unused available

production capacity if the AD order on BSS from Germany were revoked. Plaintiffs' Motion at

17. Although Plaintiffs "do not dispute the Commission's finding that unused production

capacity [that] could be used to produce BSS was available in Germany," they contest that there

was substantial evidence to support a conclusion that such an outcome was likely and would be

used to increase production to levels that would have a discernible adverse impact on the U.S.

industry, or in a way that would be significant. Id.

The Commission cites evidence that the production capacity of Plaintiffs Wieland-Werke

and Schwermetall[7] was [ a certain number of ] pounds in 1999, then peaked at [ a larger number

of ] pounds in 2002, and was [ a certain number of ] pounds in 2004. Views at 16. Their

---

[7] The combined output of Plaintiffs Wieland-Werke, Prymetall, and Schwermetall
accounted for [ a certain percentage ] of German BSS production in 2004. Prymetall noted that it
is [ a certain type of entity ]. Views at 16 n.59.

17

unutilized production capacity was [ a certain percentage ] in 1999, then peaked at [ a larger percentage ] in 2003, and was [ a certain percentage ] in 2004. Id. This evidence satisfies the first element of the likely discernible adverse impact standard, as articulated by Cogne.

In addition, the Commission provides quantitative data to support its assertion that the German producers would have some incentive to sell a discernible amount of BSS in the U.S. market, thus satisfying the second element of the likely discernible adverse impact standard, as articulated by Cogne. Specifically, the Commission relied on the fact that exports as a share of the German producers' total shipments increased from [ a certain percentage ] in 2003 to [ a larger percentage ] in 2004 to establish that the German producers are export-oriented. Views at 17, 34. Further, the Commission relied on the statement by Plaintiff Wieland-Metals that it would import additional BSS from its German parent company, Plaintiff Wieland-Werke, if the order were revoked. Id. at 34 n.140. In concluding that BSS imports would likely have a discernible adverse impact on the U.S. industry, the Commission also relied on other factors, including the vulnerability of the domestic industry, the substitutability of BSS from different sources, and underselling in the original investigations. Id. at 19.

Plaintiffs argue that the Commission must find that they have an "economic incentive" to increase imports in order to substantiate its determination, since increasing exports at lower prices "lack[s] any rational economic basis." Plaintiffs' Motion at 18, Plaintiffs' Reply at 2 (citing Siderca, 350 F. Supp. 2d at 1237-38; Chefline Corp., 25 CIT at 1137-39). Plaintiffs further assert that the "Commission's economic rationale requires that subject producer returns on U.S. sales would be high enough to cover variable costs and [are] higher than are available in other markets to which the producers sell." Plaintiffs' Reply at 3. Plaintiffs rely primarily on

Siderca to support this assertion. However, the court's holding in Siderca is not applicable. The Siderca court was reviewing the Commission's assessment of the economic factors it must consider in determining the "likely volume" component of the material injury analysis, and not the discernible adverse impact analysis. Siderca, 350 F. Supp. 2d at 1233-34. These are discrete inquiries, as "[i]n assessing likely volume for the purpose of the discernible adverse impact inquiry, even a modest likely volume may satisfy the statutory standard . . . ." Cogne, 2005 Ct. Int'l. Trade LEXIS 130, at *13. In any event, as discussed in Section IV D (1), the holding in Siderca is not applicable even to the likely volume analysis undertaken by the Commission in the instant review.

Plaintiffs argue that the Commission's "parallel findings and conclusions" with respect to France, Italy, and Japan are "unlawful for the same reasons." Plaintiffs' Motion at 31. In addition, Plaintiffs allege that the Commission's findings with respect to France, Italy, and Japan were based on "the absence of evidence," and not substantial evidence. Id. at 32.

According to the Commission, no French or Italian producers, and only one Japanese producer, responded to the questionnaire sent by the Commission prior to conducting the instant review. Views at 14, 18, 20. "There is no exception for cumulation in the statute based on non-participation in the sunset reviews." Ugine-Savoie Imphy v. United States, 26 CIT 851, 867, 248 F. Supp. 2d 1208, 1223-1224 (2002); see 19 U.S.C. § 1675a(a)(7). The Commission is required, by statute, to "use the facts otherwise available" in reaching its determination. 19 U.S.C. § 1677e(a)(2)(d).

In the instant review, the Commission evaluated information that was publicly available,

including information obtained in the original investigations and the first sunset review,[8] as well as data compiled by the United Nations. Views at 14-15, 18-20. In concluding that BSS imports from France, Italy, and Japan would likely have a discernible adverse impact on the U.S. industry, the Commission also relied on other factors, including the vulnerability of the domestic industry, the substitutability of BSS from different sources, and underselling in the original investigations. Id. at 15, 19, 20.

The Commission's determination that BSS imports from France, Germany, Italy, and Japan – evaluated on an individual, country-by-country basis – are likely to have a discernible adverse impact on the U.S. industry is reasonable and supported by the record. Thus, the Commission's ultimate decision to cumulate imports from France, Germany, Italy, and Japan is upheld.

## D

### The "Material Injury" Analysis

The Commission is directed to "consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated," when conducting a sunset review. 19 U.S.C. § 1675a(a)(1). The statute specifically provides that no one factor is dispositive; indeed, "[t]he presence or absence of any factor which the Commission is required to consider under this subsection shall not necessarily give decisive guidance with respect to the Commission's determination of whether

---

[8] The Commission is in fact required to take into account "its prior injury determinations, including the volume, price effect, and impact of imports . . . before the order was issued" when conducting a sunset review. 19 U.S.C. § 1675a(a)(1)(A).

material injury is likely to continue or recur within a reasonably foreseeable time if the order is revoked . . . ." 19 U.S.C. § 1675a(a)(5). With respect to each factor that the Commission is directed to consider, the statute provides guidance, in the form of sub-factors, designed to ensure that the Commission engages in a comprehensive analysis. See 19 U.S.C. § 1675a(a)(2) (likely volume); 19 U.S.C. § 1675a(a)(3) (likely price effects); 19 U.S.C. § 1675a(a)(4) (likely impact).

The SAA recognizes that:

> the determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping . . . is erroneous, as long as the determination of the likelihood of continuation or recurrence is reasonable in light of the facts of the case.

SAA, Pub. L. No. 103-465, at 883.

## 1

## Likely Volume of the Cumulated Subject Imports

The Commission is directed to consider all relevant economic factors when evaluating likely volume. The statute specifically directs the Commission to consider:

(A) any likely increase in production capacity or existing unused production capacity in the exporting country,

(B) existing inventories of the subject merchandise, or likely increases in inventories,

(C) the existence of barriers to the importation of such merchandise into countries other than the United States, and

(D) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

19 U.S.C. § 1675a(a)(2)(A)-(D).

21

Plaintiffs argue that the Commission must find that they have an "economic incentive" to increase imports, Plaintiffs' Motion at 18; Plaintiffs' Reply at 2, and further that the "Commission's economic rationale requires that subject producer returns on U.S. sales would be high enough to cover variable costs and [are] higher than are available in other markets to which the producers sell." Plaintiffs' Reply at 3.

As discussed in Section IV B, neither the relevant statutory provisions nor the case law binding this court require the Commission to substantiate its overall findings regarding likely volume with evidence of economic incentive. In addition, Siderca's alleged "requirement" that the Commission find economic incentive arises in the context of only one of the four sub-factors the Commission must evaluate when engaging in the likely volume analysis, 19 U.S.C. § 1675a(a)(2)(D) (potential for product shifting). The Siderca court justified its imposition of this requirement only after careful parsing of the language in that specific subsection which, as discussed below, is not applicable here.

The Commission found that revocation of the orders on BSS from the cumulated countries would likely lead to continuation or recurrence of material injury within a reasonably foreseeable time. Views at 32. The Commission's assessment with respect to the likely volume of cumulated BSS imports was based primarily on 19 U.S.C. § 1675a(a)(2)(A), the first sub-factor in the likely volume analysis, i.e. "any likely increase in production capacity or existing unused production capacity in the exporting country." Id. The Commission relied on evidence that existing unused production capacity in Germany was between [ a certain range of percentages ] during the three years preceding the sunset review, with approximately [ a certain number of ] pounds of excess capacity in 2004. Id. at 33. The Commission also relied on

evidence that supported its characterization of the German producers as export-oriented, stating that exports accounted for [ a certain percentage ] of German shipments in 2004 (an increase of approximately [ a certain percentage ] from 2003) and that German producers had maintained some market presence during the period of review. *Id.* at 17, 34. In addition, the Commission relied on the statement of Plaintiff Wieland Metals that it would import some additional BSS from its parent company in Germany, Plaintiff Wieland-Werke, if the order were revoked. *Id.* at 34-35 n.140. Further, the Commission noted that import volumes from Germany declined and were "much smaller" following the issuance of the AD order. *Id.* at 32.

The Commission's conclusion with respect to likely volume is reasonable – even though it may not be the only possibly reasonable conclusion to be drawn from the record.

### 2

### Likely Price Effects of the Cumulated Subject Imports

When evaluating likely price effects, the Commission is directed to consider whether:

(A) there is likely to be significant price underselling by imports of the subject merchandise as compared to domestic like products, and

(B) whether imports of the subject merchandise are likely to enter the United States at prices that otherwise would have a significant depressing or suppressing effect on the price of domestic like products.

19 U.S.C. § 1675a(a)(3)(A)-(B).

Plaintiffs argue that the Commission placed too great an emphasis on pricing patterns during the period of investigation prior to implementation of the AD order and should, instead, have focused their analysis on the current state of the domestic BSS industry. Plaintiffs' Motion at 31.

The Commission relied on conditions of competition in the U.S. market – specifically

that the market is "fairly price competitive" and that domestic and imported BSS are substitutable — to determine that "the pricing patterns observed in the original investigations are likely to recur and the subject imports would likely undersell the domestic like product so as to significantly depress or suppress domestic prices." Views at 36. The Commission relied on its findings with respect to likely volume as additional support for its determination regarding the likely price effects of BSS imports from the cumulated countries following revocation of the orders in question. Id. at 37. The Commission noted that BSS imports from all of the cumulated countries in the original investigation were underselling the domestic like product, and in the case of Germany, in 43 of 58 direct quarterly price comparisons. Id. at 36. Because the volume of imports from all of the cumulated countries were "significantly reduced" following the issuance of the AD and CVD orders under review, limited price comparison data was available to the Commission. Id. The Commission concluded that imports would need to be priced aggressively if the orders were revoked because the U.S. BSS market is "fairly price competitive" and the domestic like product, subject imports, and non-subject imports are substitutable. Id. Thus, in the Commission's view, the pricing patterns present before the orders were issued are likely to recur. Id. at 36-37.

While the Commission provided minimal support for its assertion that the pricing patterns present before the orders are likely to recur, it is important to note that the statute specifically states that "the presence or absence of any factor . . . shall not necessarily give decisive guidance." 19 U.S.C. § 1675a(a)(5). Indeed, it appears that the weakened state of the U.S. industry, discussed in the next section, underlies the Commission's ultimate determination that

revocation of the orders would be likely to lead to the continuation or recurrence of material injury. Notably, Plaintiffs did not challenge the Commission's findings regarding likely impact.

### 3

### Likely Impact of the Cumulated Subject Imports

When evaluating likely impact, the Commission is required to consider all relevant economic factors which are likely to have a bearing on the state of the industry in the United States. 19 U.S.C. § 1675a(a)(4). In so doing, the Commission considers:

(A) likely declines in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(B) likely negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, and

(C) likely negative effects on the existing development and production efforts of the industry, including efforts to develop a derivative or more advanced version of the domestic like product.

19 U.S.C. § 1675a(a)(4)(A)-(C).

The SAA provides that in assessing the U.S. industry's vulnerability to injury if an order is revoked, the Commission:

considers, in addition to imports, other factors that may be contributing to overall injury. While these factors, in some cases, may account for the injury to the domestic industry, they may also demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.

SAA, Pub. L. No. 103-465, at 885.

In the instant review, the Commission explained that the condition of the domestic BSS industry had deteriorated since the time of the original investigations and found it to be vulnerable to material injury. Views at 38-40. Specifically, the Commission noted the decline in the industry's capacity, production, market share, operating income, unit operating income, and

employment between 1999 and 2004. Id. at 38. The Commission also noted the decline in the industry's capital expenditures and research and development expenditures. Id. at 39.

The Commission found that because domestic producers' prices "have not kept pace with cost increases, notwithstanding the domestic industry's use of various surcharges to offset higher costs," the domestic industry is vulnerable to the continuation or recurrence of material injury if the orders are revoked. Id. at 40. The Commission also found that the cumulated subject imports would have "a significant negative impact on the production, shipments, sales, market share, and revenues of the domestic industry," further adversely impacting the domestic industry's profitability, capital raising ability and maintenance of capital investments. Id.

The Commission's determination regarding the likely impact of cumulated BSS imports in the event of revocation of the orders is reasonable and supported by the record.

## V

## CONCLUSION

For the above stated reasons, the Commission's determination in the five-year sunset review in Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, and Japan, USITC Pub. 3842, Inv. Nos. 701-TA-269 and 731-311-314, 317, and 379 (Second Review) (March 2006) is affirmed.

Dated:    November 7, 2007
          New York, New York

/s/ Evan J. Wallach
Evan J. Wallach, Judge

26

UNITED STATES COURT OF INTERNATIONAL TRADE

WIELAND-WERKE AG, PRYMETALL
GmbH & CO. KG, SCHWERMETALL
HALBZEUGWERK GmbH & CO. KG
and WIELAND METALS, INC.,

        Plaintiffs,

        v.

UNITED STATES,

        Defendant,

        and

EAGLE BRASS CO., HEYCO METALS
INC., LUVATA BUFFALO, INC.,
OLIN CORPORATION-BRASS GROUP,
PMX INDUSTRIES, INC., REVERE
COPPER PRODUCTS, INC., and
SCOTT BRASS,

        Defendant-Intervenors.

Before:    WALLACH, Judge
Court No.:  06-00135

## ORDER AND JUDGMENT

This case having come before the court upon the Motion for Judgment Upon the Agency Record filed by Wieland-Werke AG, Prymetall GmbH & Co. KG, Schwermetall Halbzeugwerk GmbH & Co. KG, and Wieland Metals, Inc. ("Plaintiffs' Motion"); the court having reviewed all pleadings and papers on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED ADJUDGED AND DECREED that Plaintiffs' Motion is DENIED; and it is further

ORDERED ADJUDGED AND DECREED that the decision of the United States International Trade Commission in Brass Sheet and Strip from Brazil, Canada, France, Germany, Italy, and Japan, USITC Pub. 3842, Inv. Nos. 701-TA-269 and 731-311-314, 317, and 379 (Second Review) (March 2006) is hereby AFFIRMED; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the

court in writing on or before Thursday, November 15, 2007, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter. The parties shall suggest alternative language for any portions they wish deleted. If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before November 15, 2007.

/s/ Evan J. Wallach
Evan J. Wallach, Judge

Dated: November 7, 2007
New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____    By: _____
                                            Deputy Clerk